# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAH LIQUIDATING CORP. (f/k/a FISKER AUTOMOTIVE HOLDINGS, INC.), *et al.*, | ) ) | Case No. 13-13087 (KG) (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| EMERALD CAPITAL ADVISORS CORP., in Its Capacity as Trustee for the FAH Liquidating Trust, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 15-51898 (KG) |
| | ) | |
| v. | ) | |
| | ) | |
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, | ) ) | **Re: Adv. Dkt. No. 103** |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is the motion (the "Motion") of Bayerische Motoren Werke Aktiengesellschaft ("BMW" or "Defendant") seeking summary judgment on Count V of the adversary complaint (the "Complaint") filed by Emerald Capital Advisors Corp. (the "Plaintiff" or "Trustee"), as trustee for the FAH Liquidating Trust (f/k/a Fisker Automotive Holdings, Inc.). For the reasons discussed below, the Court will grant the Motion.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The claim of unjust enrichment is a non-core claim and does not fall within

1

Section 157(b)(2). *Liquidating Tr. of the MPC Liquidating Tr. v. Granite Fin. Sols., Inc. (In re MPC Computs., LLC)*, 465 B.R. 384, 393 (Bankr. D. Del. 2012) (finding claim for unjust enrichment to be a non-core claim, but the court had "related to" jurisdiction over the adversary proceeding). The jurisdiction of the Court over this action is not disputed.

## FACTS

Fisker Automotive Holdings, Inc. ("Fisker") was formed in 2007 to develop hybrid electric cars. *See* Decl. of Marc Beilinson in Supp. of First Day Mots. ¶ 5, Case No. 13-13087, D.I. 3. In October 2011, Fisker started delivering its first vehicle, the "Karma" sedan. *Id.* ¶ 17. Fisker also planned to develop a second sedan called the "Nina." *Id.* ¶ 18.

On April 15, 2011, Fisker and BMW entered into a Preliminary Development Agreement ("Development Agreement"), pursuant to which BMW was to begin "preliminary development work . . . for the installation of BMW N26B20 engines with parts and components into a Fisker Nina vehicle." Declaration of Bernhard Marx, dated Dec. 4, 2019 ("Marx Decl.") Ex. B, § 1. D.I. 105. Section 6.2 of the Development Agreement obligated Fisker to pay BMW a total of €700,000 in three separate tranches. Marx Decl. Ex. B, § 6.2.

On July 8, 2011, Fisker and BMW entered into a Purchase, Supply, and Development Agreement (as later amended, the "Supply Agreement"), pursuant to which "BMW [was] willing to supply N20B20 engines and other related parts and components to Fisker for the Nina program, subject to the terms and conditions of [the] Agreement." Declaration of Mark Minuti, dated June 7, 2019 ("Minuti Decl.") Ex. A, Preamble. D.I. 123. Under the Supply Agreement, Fisker was required to make a series of

2

upfront payments to BMW for the N20B20 engines (the "N20"), which totaled €66 million (the "Upfront Payments").[1] Minuti Decl. Ex. A, App. 5.2.1. The Upfront Payments were "based on a global volume of 515,000 engines," and "comply with cost for BMW to install the necessary capacity for Fisker." Id. "These amounts . . . need[ed] to be paid, regardless of the actual volumes attained." Id.

The Supply Agreement allowed the parties to terminate the contract in certain instances. Minuti Decl. Ex. A, § 17. Generally, "[t]ermination of [the Supply] Agreement, however occurring, shall not affect any accrued rights of either party." Minuti Decl. Ex. A, § 17.11. Yet, if BMW elected to terminate the Supply Agreement, the Supply Agreement included a specific formula for back payment of the Upfront Payments. Minuti Decl. Ex. A, App. 5.2.2.

Between August 2011 and July 2012, Fisker transferred a total of €22,536,275 to BMW (the "Transfers"). Marx Decl. ¶ 8. BMW received these payments pursuant to the Development Agreement or Supply Agreement on the following dates:

| Date | Payment Amount | Relevant Provision Requiring Payment |
|---|---|---|
| August 1, 2011 | €12,000,000 | Supply Agreement Appendix 5.2.1 |
| August 1, 2011 | €10,000,000 | Supply Agreement Appendix 5.2.1 |
| April 5, 2012 | €300,000 | Development Agreement § 6.2 |
| April 12, 2012 | €31,000 | Development Agreement § 6.2 |
| July 30, 2012 | €205,275 | Development Agreement § 6.2 |
| Total: | €22,536,275 | |

---

[1] The Upfront Payments included three fixed payments of €22 million per year from 2011 to 2013. Minuti Decl. Ex. A, App. 5.2.1. "One fourth of the yearly amount ha[d] to be paid on a quarterly basis at the end of each quarter." Id.

3

BMW used the funds it received from Fisker to invest in, *inter alia*, its facilities in Munich, Germany and Hams Hall, England. Minuti Decl. Ex B, at 10-13. BMW decided to produce Fisker's N20 engine in its Munich facility; thus, BMW reconfigured its existing N20 assembly lines in Munich to account for Fisker's customized version of the N20 engine. *Id.* at 12. However, the production of N20 engines for Fisker in Munich required a change in the anticipated production site of the B38 and B48 engines (both for use in BMW cars), which BMW originally intended to produce in Munich. *Id.* at 12-13. BMW shifted production of its B38 and B48 engines to Hams Hall where, unlike in Munich, space was available to add new assembly lines. *Id.* at 13.

On November 22, 2014 (the "Petition Date"), Fisker filed a petition for relief under Chapter 11. Declaration of Samuel R. Rowley, dated Apr. 15, 2019 ("Rowley Decl.") ¶ 3. D.I. 106. Then on May 22, 2014, Fisker rejected the Supply Agreement pursuant to Section 365(a) of the Bankruptcy Code. *Id.*

On November 19, 2015, the Trustee filed a five count Complaint against BMW. Counts I-IV assert fraudulent transfer claims. Compl. ¶¶ 18-34. Count V alleges that BMW "unjustly retained" Fisker's Transfers. Compl. ¶¶ 16, 35-37 ("Upon information and belief, [BMW] did not manufacture or deliver to [Fisker] engines pursuant to the [Supply] Agreement or otherwise give any value to [Fisker] in exchange for the Transfers."). Last year, the Court dismissed Counts I-IV, except for a disputed claim for $793,761.87. Mem. Op. 15, 26. Now, BMW seeks summary judgment to dismiss the Trustee's unjust enrichment claim.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine "when reasonable minds could disagree on the result." *Delta Mills, Inc. v. GMAC Comm. Fin., Inc. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009). The moving party bears the burden of demonstrating an entitlement to summary judgment. *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 141 (E.D.N.Y. 2009).

Summary judgment serves to "isolate and dispose of factually unsupported claims or defenses" and avoid unnecessary trial where the facts are settled. *In re Delta Mills, Inc.*, 404 B.R. at 104 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Thus, at the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) (citing *Celotex*, 477 U.S. at 317); *see also* Fed. R. Civ. P. 56(c). In making this determination, the court must view all facts in the light most favorable to the non-movant and must draw all reasonable inferences from the underlying facts in favor of the non-movant. *McAnaney*, 665 F. Supp. 2d at 141; *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). Any doubt must also be construed in the non-moving party's favor. *In re Delta Mills, Inc.*, 404 B.R. at 105.

Once the moving party provides sufficient evidence, the burden shifts to the nonmoving party to rebut the evidence. *In re Delta Mills, Inc.*, 404 B.R. at 105. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *McAnaney*, 665 F. Supp. 2d at 141 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)). "[T]he mere existence of some alleged factual dispute between the parties" cannot defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 247-48. The dispute must relate to a genuine issue of material fact. *In re Delta Mills, Inc.*, 404 B.R. at 105. Thus, a non-moving party cannot defeat a summary judgment motion based on conclusory allegations and denials, but instead must provide supportive arguments or facts that show the necessity of a trial. *McAnaney*, 665 F. Supp. 2d at 141.

Summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## DISCUSSION

BMW seeks summary judgment on the Complaint's unjust enrichment claim (Count V). The principal question before the Court is whether the Supply Agreement governs the unjust enrichment claim the Trustee raised in the Complaint. If the Supply Agreement addresses the rights and obligations that are the subject of the unjust enrichment claim, the Trustee cannot recover under the theory of unjust enrichment. *See Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.)*, 353 B.R. 77, 85 (Bankr. D. Del. 2006).

6

However, as a threshold issue, the Court must determine whether Delaware or German law applies to the unjust enrichment claim. BMW argues that German law applies to the unjust enrichment claim because German law governs the Supply Agreement. *See* Minuti Decl. Ex. A, § 22.1. But the Trustee reminds the Court that it previously applied Delaware law when BMW moved to dismiss the Complaint. Before the Court engages in a complex analysis of the choice-of-law question, the Court must first determine whether there exists a true conflict between the application of Delaware and German law. *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997). "Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question." *Id.*

Although the parties clearly disagree as to how the Court should rule on the Motion, they concur that both Delaware and German law should render the same result. Based on the analysis below, the Court finds that both Delaware and German law instruct the Court to grant the Motion. Accordingly, the Court need not engage in an extensive choice-of-law analysis.

### A.    The Result Under Delaware Law

Delaware law defines unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). "The elements of unjust enrichment are: (1) an enrichment, (2) an

impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.*

An unjust enrichment claim "cannot lie in the face of an express contract." *Official Comm. of Unsecured Creditors v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 285 (Bankr. D. Del. 2018). However, an action for unjust enrichment "may proceed where an express contract exists, so long as the rights and obligations that are the subject of that claim are not governed exclusively by the contract at issue." *Avantix Labs., Inc. v. Pharmion, LLC*, No. N10C-01-010, 2012 WL 2309981, at *9 (Del. Super. Ct. June 18, 2012).

First, the Trustee argues that it can raise an unjust enrichment claim because BMW's investment of the Transfers falls outside the scope of the Supply Agreement. Pursuant to the Supply Agreement, Fisker's Upfront Payments cover, *inter alia*, "structural invest, machining, tooling, [and] development costs," and BMW must use the Upfront Payments to "install the necessary capacity for Fisker." Minuti Decl. Ex. A, App. 5.2.1. According to the Trustee, BMW used the Upfront Payments not to expand capacity for Fisker's N20 engine, but for BMW's own B38 and B48 engines. Thus, the Trustee asserts that further discovery "is . . . needed to determine whether BMW and Fisker arrived at a meeting of the minds that the Supply Agreement gave BMW the right and/or obligation to use the funds received from Fisker on BMW's own production line." Pl.'s Opp'n 11.

According to BMW, even if its use of the Upfront Payments on the production of B38/B48 engines did not constitute a "cost . . . to install the necessary capacity for Fisker,"

8

the Supply Agreement still governs how BMW was to use the Upfront Payments. Thus, BMW argues that the Trustee raises a breach of contract issue, not an unjust enrichment claim. Regardless, BMW asserts that the cost to relocate its B38 and B48 production capability from its Munich facility to its Hams Hall facility "was absolutely a cost for [BMW] in order to install the necessary capacity for Fisker" because the displacement opened sufficient space in the Munich facility to produce the required volumes of N20 engines. Def.'s Reply 4.

The Court finds that the Supply Agreement addresses each party's rights and duties with respect to the use of the Upfront Payments. The Supply Agreement provides BMW with the right to receive the Upfront Payments from Fisker, and the obligation to use the Upfront Payments to "install the necessary capacity for Fisker." Because "the obligations or rights that are the subject of [the] claim are . . . exclusively governed by the contract at issue," the Trustee cannot recover under the quasi-contractual theory of unjust enrichment. *See In re Quintus Corp.*, 353 B.R. at 85.

Next, the Trustee argues that it can bring an unjust enrichment claim because "BMW's conduct . . . left Fisker with no remedy under the Supply Agreement." Pl.'s Opp'n 12. The Trustee alleges that BMW had the ability to terminate the Supply Agreement when Fisker missed payment deadlines. If BMW terminated the Supply Agreement, it would have been required to return a portion of the Upfront Payments to Fisker in accordance with the "Back Payment" formula identified in Appendix 5.2.2 of the Supply Agreement. Yet, BMW elected to continue operating under the Supply Agreement, and to continue spending the Upfront Payments. Because "the Supply

9

Agreement is silent as to what happens with the Upfront Payments in any other instance besides a cancellation of the Supply Agreement by BMW," the Trustee asserts that it can only seek remedies through an unjust enrichment claim.

The pertinent provisions of the Supply Agreement that regulate the Upfront Payments appear in Appendix 5.2 and Section 17. Appendix 5.2.1 instructs Fisker that the Upfront Payments "will be paid as installments on a fixed basis," and "these amounts will still need to be paid, regardless of actual volumes [of engines] attained." Minuti Decl. Ex. A, App. 5.2.1. Section 17.11 of the Supply Agreement explains that "[t]ermination of this agreement, *however occurring*, shall not affect any accrued rights of either party." Minuti Decl. Ex. A, § 17.11 (emphasis added). However, Appendix 5.2.2 grants Fisker rights to "[b]ack payment of the Upfront Payments in case of cancellation from BMW." Minuti Decl. Ex. A, App. 5.2.2.

Again, the Court finds that the Supply Agreement governs how the parties were to manage the Upfront Payments. If the Supply Agreement remained effective and was not terminated, Fisker was obligated to pay the Upfront Payments, regardless of volumes attained. If the Supply Agreement terminated for any reason (except if BMW terminated the contract), accrued Upfront Payments remained with BMW, and the obligation for Fisker to make further payments ended. Thus, "there is no absence of remedy provided by law because the [Supply Agreement] govern[s] the relationship between [Fisker] and BMW]." *J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 458 (D. Del. 2013).

10

Lastly, the Trustee contends that the Court may provide a remedy for Fisker pursuant to Section 21.3 of the Supply Agreement.[2] Under Section 21.3, "should a gap in this Agreement be found, . . . an appropriate provision shall apply being . . . as close as possible to the intentions the parties hereto have pursued or might have pursued in accordance with the meaning and intention of this Agreement." Section 21.3 resembles Delaware's law on the implied covenant of good faith and fair dealing. *See Oxbow Carbon & Minerals Holdings, Inc. v. Crewstview-Oxbow Acquisition, LLC*, 202 A.3d 482, 506-07 (Del. 2019) (explaining that the law on implied covenants "is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions"). An implied covenant "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Id.* at 507. Rather, "the covenant is a limited and extraordinary legal remedy." *Id.* As such, the implied covenant "does not apply when the contract addresses the conduct at issue . . . and [a court] should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Id.*

Here, the Court declines to apply Section 21.3 of the Supply Agreement because no "gap" exists concerning the management of the Upfront Payments. The Supply Agreement addresses each party's rights and obligations with respect to the Upfront

---

[2] The Trustee raised this argument for the first time during oral argument on August 13, 2019.

Payments in Appendix 5.2 and Section 17. Therefore, applying Delaware law, the Court will grant the Motion and will dismiss Count V, the Trustee's unjust enrichment claim.

### B. The Result Under German Law[3]

Under German law, where a binding and enforceable contract governs the relationship between the parties, an unjust enrichment claim cannot lie.[4] The German Civil Code (Bürgerliches Gesetzbuch – "BGB") recognizes claims for unjust enrichment. "A person who obtains something as a result of the performance of another person . . . *without legal grounds for doing so* is under a duty to make restitution to him." *See* Schwarze Decl. ¶ 12 (emphasis added) (quoting Federal Ministry of Justice and Consumer Protection Translation of § 812 para. 1 BGB). A party obtains an enrichment "without legal grounds" when "no legal basis . . . justifies the final retention of the enrichment by the receiver." *Id.* ¶¶ 12, 18. However, when a party makes a payment pursuant to a contract, the recipient has obtained the payment "*with* legal grounds." *Id.* ¶ 20 (emphasis added).

Here, the parties do not dispute that Fisker made the Transfers to BMW pursuant to obligations under a valid contract. Therefore, BMW obtained the Transfers "with legal

---

[3] "In determining foreign law, the court may consider any relevant material source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See* Fed. R. Bankr. P. 9017; Fed. R. Civ. P. 44.1.

[4] The Declaration of Dr. Torsten Schwarze, dated April 15, 2019 ("Schwarze Decl.") (D.I. 107), which BMW submitted, advances the following dispositive proposition: "if a transfer of assets has been effected under a contract that was valid at the time of the transfer . . . , a claim for an unjust enrichment remedy under [German law] will not lie." Schwarze Decl. ¶ 19. The Trustee never challenges this proposition despite filing its own German-law declaration. *See* Declaration of Tobias Glienke, dated June 7, 2019 (D.I. 125).

grounds," and the Court concludes that a claim for unjust enrichment is not available. The Court, applying German law, will grant the Motion and therefore will dismiss Count V of the Complaint.

## CONCLUSION

At first glance, and putting aside the legal ramifications, the Motion presented an appearance of troublesome facts. It seemed that BMW had taken extreme advantage of Fisker which was a distressed company. Fisker paid €22 million to BMW and never received a single engine. That first glance, however, failed to take into account Fisker's and BMW's agreement in the Supply Agreement that BMW would use the Upfront Payments to prepare its production line for the production of the Fisker engines, i.e. the N20 engines. BMW claims it spent €47 million to prepare for the production and lost money on the transaction. Now, whether BMW lost money or made money is legally irrelevant as the foregoing discussion reveals. The Court's conscience is, however, assuaged by the possibility that BMW was not enriched.

The Court will grant BMW's motion for summary judgment on Count V of the Complaint. The Trustee cannot raise an unjust enrichment claim to recover the Transfers because a binding contract exists that adequately addresses each party's rights and duties. The Court will enter an order giving effect to its ruling.

Dated: August 26, 2019

_Kevin Gross_
KEVIN GROSS, U.S.B.J.